

# In the
# Court of Appeals
# Second Appellate District of Texas
# at Fort Worth

———————————————

No. 02-22-00109-CV

———————————————

MICHAEL NAZARIAN MD ASSOC. LLC, Appellant

V.

AETNA LIFE INSURANCE COMPANY, INC., Appellee

On Appeal from the 141st District Court
Tarrant County, Texas
Trial Court No. 141-326239-21

Before Kerr, Birdwell, and Walker, JJ.
Memorandum Opinion by Justice Walker

## MEMORANDUM OPINION

This is a Chapter 1467 arbitration dispute between Appellant Michael Nazarian MD Assoc., LLC (MNMA) and Appellee Aetna Life Insurance Company, Inc. (Aetna) over the amount MNMA should have been reimbursed for performing out-of-network emergency medical services for one of Aetna's enrollees (the Patient). In five issues, MNMA appeals the trial court's judgment affirming the arbitrator's award of $1,672.07 to MNMA.[1] We will affirm.

## I. CHAPTER 1467 ARBITRATION

Chapter 1467 of the Insurance Code was codified in 2019 to provide an expedited arbitration process for settling payment disputes between insurance companies and out-of-network healthcare providers.[2] *See* Tex. Ins. Code Ann. §§ 1467.089(a), .084(a). Chapter 1467 arbitration proceedings are not subject to the more familiar arbitration rules found in Title 7 of the Texas Civil Practice and Remedies Code. *Id.* § 1467.085(b).

---

[1]We note that we recently decided a dispute between MNMA and Aetna in which we were presented with materially similar facts and similar arguments in *Aetna v. Michael Nazarian MD Assoc. LLC* (*Nazarian I*). *See* 653 S.W.3d 752, 753 (Tex. App.—Fort Worth 2022, pet. filed). In *Nazarian I*, we held that substantial evidence supported the arbitrator's award in Aetna's favor and reversed the trial court's order, which had vacated the arbitrator's award and rendered a higher reimbursement amount. *Id.* at 758.

[2]Under Texas law, insurers such as Aetna are required to directly reimburse out-of-network emergency care providers at "the usual and customary rate or at an agreed rate" to ensure that an enrollee is not penalized for utilizing an out-of-network provider for emergency care. Tex. Ins. Code Ann. § 1579.109(b).

After a Chapter 1467 arbitration is initiated, the parties must first participate in a statutorily-mandated settlement teleconference. *Id.* § 1467.084(d). If no settlement is reached, an arbitrator is tasked with making a single determination: the reasonable amount to be paid for the provided out-of-network services. *Id.* § 1467.083. The parties "may not engage in discovery," *id.* § 1467.087(b), but instead must "submit written information" to the arbitrator concerning the amount charged by the provider and the amount actually reimbursed by the insurer, 28 Tex. Admin. Code § 21.5021(g)(2). "If a party does not respond to the arbitrator's request for information, the dispute will be decided based on the available information received . . . ." *Id.* at § 21.5021(g)(6).

Upon receiving this information, the arbitrator "must take into account" ten factors in rendering its decision:

(1) whether there is a gross disparity between the fee billed by the out-of-network provider and:
  (A) fees paid to the out-of-network provider for the same services or supplies rendered by the provider to other enrollees for which the provider is an out-of-network provider; and
  (B) fees paid by the health benefit plan issuer to reimburse similarly qualified out-of-network providers for the same services or supplies in the same region;
(2) the level of training, education, and experience of the out-of-network provider;
(3) the out-of-network provider's usual billed charge for comparable services or supplies with regard to other enrollees for which the provider is an out-of-network provider;
(4) the circumstances and complexity of the enrollee's particular case, including the time and place of the provision of the service or supply;

3

(5)     individual enrollee characteristics;

(6)     the 80th percentile of all billed charges for the service or supply performed by a health care provider in the same or similar specialty and provided in the same geozip area as reported in a benchmarking database described by Section 1467.006;

(7)     the 50th percentile of rates for the service or supply paid to participating providers in the same or similar specialty and provided in the same geozip area as reported in a benchmarking database described by Section 1467.006;

(8)     the history of network contracting between the parties;

(9)     historical data for the percentiles described by Subdivisions (6) and (7); and

(10)    an offer made during the informal settlement teleconference required under Section 1467.084(d).

Tex. Ins. Code. Ann. § 1467.083(b)(1)–(10); *see* 28 Tex. Admin. Code § 21.5021(g)(2)–(3).

The arbitrator must then (1) determine which party's offered amount—as modified after either an internal appeal process or the mandatory settlement teleconference—is closest to the reasonable amount for the provided services and (2) select that amount as its binding award. Tex. Ins. Code. Ann. § 1467.088(a).

Finally, "a party not satisfied with the decision" may seek judicial review of the arbitrator's award by filing "an action to determine the payment due to an out-of-network provider." *Id.* § 1467.089(b). In such an action, "the court shall determine whether the arbitrator's decision is proper based on a substantial-evidence standard of review." *Id.* § 1467.089(c).

4

## II.  BACKGROUND

### A.  FACTUAL BACKGROUND

Dr. Michael Nazarian is a cardiothoracic surgeon who provides emergency medical services for MNMA.  On March 2, 2021, Nazarian performed open-heart surgery on the Patient[3] after she presented with an accumulation of fluid around her heart.  After the successful surgery, the Patient spent four days in the ICU during which Nazarian oversaw her care.  Nazarian claimed that "[i]n total, over 64 hours were spent" caring for the Patient.

For this care, MNMA billed Aetna under Current Procedural Terminology (CPT) codes 33025 and 99223.[4]  In total, MNMA billed Aetna $27,090, claiming that its customary rate for code 33025 was $24,030, and its customary rate for code 99223 was $3,060.  Aetna reimbursed MNMA only $928.93 on this bill.

### B.  ARBITRATION PROCEEDINGS

Unhappy with this reimbursement amount, MNMA requested arbitration under Chapter 1467.  *See* Tex. Ins. Code Ann. § 1467.081.  At the mandatory pre-arbitration

---

[3]Nazarian had previously treated the Patient before.  In December 2020, shortly after she had been diagnosed with cancer, Nazarian treated her for shortness of breath.  And, shortly before her open-heart surgery, Nazarian had performed a procedure to drain fluid from around her heart.  The present dispute does not involve medical charges for any of this care.

[4]CPT codes "are uniform codes for medical, surgical, and diagnostic services that have been developed and published by the American Medical Association and are standardized throughout the country."  *In re Allstate Indem. Co.*, 622 S.W.3d 870, 874 n.2 (Tex. 2021) (orig. proceeding).

mediation, Aetna made a final offer of $1,672.07 and MNMA made a final offer of $13,545. The parties failed to settle, and their case was assigned to an arbitrator. The arbitrator requested that each party "provide [him] with any health care cost information/evidence they wish to present to support the 10 factors listed in the Texas Insurance Code Section 1467.083 . . . ." *See id.* § 1467.083(b). He explained that he was "required to examine the information submitted and the factors per the Insurance Code section indicated above and render a decision . . . ."

### 1. Responsive Information

The parties provided the arbitrator with information responsive to the ten statutory factors. *See id.*

### a. Factor one: gross disparity between billing and fees paid

MNMA asserted that no gross disparity existed between the fees it has historically billed and the fees it has been reimbursed for these same services or the fees paid by Aetna to reimburse other similarly-qualified providers for these same services. To support this, MNMA attached ten pages of heavily redacted billing and reimbursement statements. These statements purportedly show that MNMA, in at least eight instances, had billed $3,060 for CPT code 99223 to Aetna and two other insurance providers. For these bills, MNMA had been reimbursed the full amount twice, but never less than $2,295. The statements also showed that MNMA had billed $24,030 for CPT code 33025 on two occasions, though neither was billed to Aetna. It

6

appears that MNMA was reimbursed the full amount for one of these bills and approximately $18,000 for the other.

Aetna responded that there was a gross disparity between MNMA's billed fees and the fees paid by Aetna to reimburse similarly qualified providers for the same services. It stated that the original reimbursement amount of $928.93 represented "benchmark values established using various factors," including the amount Aetna typically reimbursed to other similar providers for the same services.

### b. Factor two: Nazarian's qualifications

MNMA explained that Nazarian's qualifications included eleven years of medical training and seven years of independent cardiothoracic experience. Aetna deferred to MNMA on this factor.

### c. Factor three: MNMA's usual billed charges for these services

MNMA stated that its usual billed charge for CPT code 33025 was $24,030 and for code 99223 was $3,060. Aetna deferred to MNMA on this factor.

### d. Factors four and five: complexity of the Patient's case and characteristics

Nazarian explained in detail the Patient's "complex medical history" and the services and care provided to her by MNMA. Aetna deferred to MNMA on this factor.

### e. Factors six and seven: benchmarking data

As to the benchmarking data, MNMA alleged that the FAIR Health database[5] was inaccurate and unreliable. In support of this contention, MNMA supplied an affidavit from its former billing manager, Mary Elliot, who attested to conversations she had with a FAIR Health representative, Randy Devereaux, concerning FAIR Health's data and reporting methodologies. Elliot summarized their final conversation and Devereaux's conclusions:

> In January 2021, I contacted FAIR Health to dispute the rates reported to FAIR Health. During a scheduled conference call with Mr. Devereaux, he explained FAIR Health's process for reporting. 1) FAIR Health removes what they consider "outlier" rates, which include the uppermost and lowest rates, based on their assumption that these rates are reporting inaccuracies, and 2) actual billed charges are only reported when enough reports of the CPT code occur within a 6[-]month period. If the CPT code was not reported at least 10 times within a 6[-]month period, by the contributing plans, then FAIR Health does not report the actual billed charges and, instead, utilizes their own methodology to determine what fee to report. We specifically discussed two codes: 15756 and 15738. In January 2020, FAIR Health reported the following values for these codes: 15756=$12235.76 and 15738=$5920.15. In July 2020, FAIR Health reported the following values for these same two codes: 15756=$89999.99 and 15738=$5788.34. In January 2021, FAIR

---

[5]Pursuant to Section 1467.006's directive, the Texas Department of Insurance (TDI) selected FAIR Health as its benchmarking database to be used by arbitrators in making their reasonable reimbursement determinations in Chapter 1467 arbitrations. *See* Tex. Ins. Code Ann. § 1467.006 (requiring TDI to "select an organization to maintain a benchmarking database" that "must contain information necessary to calculate . . . for each geozip area in this state . . . the 80th percentile of billed charges of all physicians or health care providers" and "the 50th percentile of rates paid to participating providers"); TEX. DEP'T OF INS., *FAIR Selected as Arbitration Benchmarking Database*, https://www.tdi.texas.gov/medical-billing/tdi11262019.html (last visited April 17, 2023).

Health reported the following values for these same two codes: 15756=$12192.41 and 15738=$39675.00. When I explained that we are the only provider reporting these codes for our geozip, and our rate did not change, Mr. Devereaux explained that the discrepancies were due to the codes not meeting the criteria to have actual billed charges reported, and therefore, FAIR Health utilized their replacement methodology.

MNMA also submitted a two-page document that appears to have come from a frequently-asked-questions (FAQ) section of FAIR Health's website. On this document, in response to the question "Who can submit data?" to FAIR Health, the following answer is provided:

> Health plans, insurance carriers and third-party administrators may contribute claims data to FAIR Health. FAIR Health regrets that it cannot accept claims submissions from healthcare practitioners, due to the high probability that provider claims will result in the duplication of data already within the database.

MNMA claimed that Elliot's affidavit and the FAIR Health FAQ document established that:

- FAIR Health does not calculate the 80th percentile of billed charges pursuant to Section 1467.006 but rather sometimes "derives its data from contracted rates instead of regular billed charges";

- FAIR Health "deletes any rates that it considers outliers";

- FAIR Health "does not report actual billed charges for infrequent CPT codes and instead utilizes their own methodology to determine what fee to report"; and

- FAIR Health's data comes only from insurance companies rather than healthcare practitioners.

9

Despite these grievances, MNMA was able to provide the following data from the FAIR Health database:

| CPT Code | 80th Percentile of Billed Charges | 50th Percentile of Rates Paid |
|---|---|---|
| 33025 | $2,800.01 | $1,138.64 |
| 99223 | $647.00 | $251.08 |

For its part, Aetna simply referred the arbitrator to the FAIR Health database to obtain these values.

### f. Factor eight: history of network contracting between Aetna and MNMA

On this factor, MNMA asserted that Nazarian was "in-network for many years with Aetna, however, after consistently being faced with an inability to negotiate contract rates, he left the network." Aetna responded that it

> strives to successfully negotiate contracts with all out-of-network providers/groups in order to provide the most robust network options for all Members. This is especially important in situation [sic] whereas the options of available providers is [sic] limited by the exclusive arrangement that HBP Groups secure with the hospitals for which they provide services. The absence of alternate options presents a challenge for negotiations that focus on maintaining market competitive reimbursement that aligns with efforts to stabilize the overall medical cost as much as possible.

### g. Factor nine: historical data for factors six and seven

Neither party submitted particular historical data. Rather, MNMA again disputed the validity of the FAIR Health data and asserted that the historical data is "not readily available to providers." Aetna stated that a "[c]omparison of historical

10

data confirms increases that significantly exceed standard medical costs and resource-based relative values established for cost-based calculations."

### h. Factor ten: final offers

Aetna's final, pre-arbitration offer was $1,672.07 and MNMA's was $13,545.

## 2. The Arbitrator's Decision

The arbitrator notified the parties of his decision via a short letter: "This email and letter are to inform you that I have determined after reviewing all submissions provided to me by the parties that [Aetna]'s offer is the most reasonable offer."

## C. TRIAL COURT PROCEEDINGS

MNMA sought judicial review of the arbitrator's award. *See id.* § 1467.089(b)–(c). It asked the trial court to determine the proper reimbursement due to MNMA, claiming that the arbitrator's award was not based on substantial evidence and failed to properly consider Section 1467.083's ten factors, and because Aetna participated in the arbitration in bad faith. MNMA also asserted that the arbitrator had a conflict of interest because he had arbitrated for Aetna before but did not disclose this information to MNMA. Alternatively, MNMA asked the trial court for "judgment reversing the decision issued by the Arbitrator or remanding the matters to TDI for reassignment."

After being provided with the arbitrator's record and briefed by the parties, the trial court affirmed the arbitrator's award. It found that the award "was supported by

11

substantial evidence and was not otherwise arbitrary and capricious." MNMA appeals from this judgment.

## III. STANDARD OF REVIEW

We review de novo a trial court's substantial evidence review. *Tex. Dep't of Pub. Safety v. Gilfeather*, 293 S.W.3d 875, 878 (Tex. App.—Fort Worth 2009, no pet.) (op. on reh'g). The only issue to consider under substantial evidence review is whether there was "some reasonable basis" for the complained-of decision—not whether the decision was correct. *Mireles v. Tex. Dep't of Pub. Safety*, 9 S.W.3d 128, 131 (Tex. 1999) ("In fact, an administrative decision may be sustained even if the evidence preponderates against it."); *see* Tex. Gov't Code Ann. § 2001.174; *Tex. Dep't of Pub. Safety v. Axt*, 292 S.W.3d 736, 738 (Tex. App.—Fort Worth 2009, no pet.). In other words, a party seeking to overturn a decision under substantial evidence review faces a "formidable" burden of proof—the decision must be upheld if there is any evidence to support it. *Axt*, 292 S.W.3d at 739; *see Montgomery Indep. Sch. Dist. v. Davis*, 34 S.W.3d 559, 566 (Tex. 2000) (holding that a reviewing court must affirm the decision even if there is "only more than a mere scintilla" of evidence to support the decision). Thus, a court may not substitute its judgment for that of the deciding entity on the weight of the evidence. *City of Dall. v. Stewart*, 361 S.W.3d 562, 566 (Tex. 2012) (citing Tex. Gov't Code Ann. § 2001.174); *see Firemen's & Policemen's Civil Serv. Comm'n v. Brinkmeyer*, 662 S.W.2d 953, 956 (Tex. 1984) (stating that a court reviewing for substantial evidence "may not substitute its judgment for that of the agency on

controverted issues of fact" because the question to be determined "is strictly one of law").

## IV.  DISCUSSION

MNMA raises five issues on appeal: (1) whether substantial evidence supported the arbitrator's decision in Aetna's favor, (2) whether the trial court erred in failing to overturn the arbitrator's "unsupported decision," (3) whether a Chapter 1467 arbitrator's failure to explain its decision deprives a party of its right to meaningful judicial review, (4) whether the trial court "otherwise erred" by affirming the arbitrator's unexplained decision, and (5) whether the appropriate remedy here is to reverse and render judgment or to remand for the trial court to determine the amount due.

### A.  AT LEAST SOME EVIDENCE SUPPORTED THE ARBITRATOR'S DECISION

With its first issue, MNMA argues that the arbitrator's award was not supported by substantial evidence.  Specifically, MNMA argues that the ten statutory factors favored MNMA and that the FAIR Health data was legally insufficient to support the award.

Aetna argues that the information submitted to the arbitrator—in particular the FAIR Health data—provided a sufficiently reasonable basis to support the arbitrator's award.  According to Aetna, the reliability of the FAIR Health data is not a permissible issue to review within a Chapter 1467 proceeding, particularly where TDI has not been made a party to the action.  And, says Aetna, in discrediting the FAIR

13

Health data in favor of the information responsive to the other factors, MNMA requests that this court improperly reweigh the evidence.

We hold that there was at least some evidence—including the FAIR Health data—to support the arbitrator's decision.

### 1. The Arbitrator Could Consider the FAIR Health Data

The crux of MNMA's argument against the FAIR Health database is that, because it does not contain information that can be used to reliably calculate the 80th and 50th percentiles, the data thus did not come from "a benchmarking database described by Section 1467.006" and could not be considered by the arbitrator in making his determination. *See* Tex. Ins. Code Ann. §§ 1467.006, 1467.083(b)(6)–(7). MNMA argues that it presented undisputed evidence of the database's unreliability by way of Elliot's affidavit and the FAIR Health FAQ document.

MNMA reads too much into Section 1467.006's requirements. Section 1467.006 merely requires the commissioner of TDI to "select an organization to maintain a benchmarking database" that "must contain information necessary to calculate" the 80th and 50th percentiles. *Id.* § 1467.006(b)–(c). Section 1467.006 does not specify how those calculations must be made or what type of information must be used to make them. MNMA's own evidence showed that FAIR Health's database contained information—albeit only as reported by the insurance companies and accounting for outliers or underreported CPT codes—and that this information was used to calculate the percentiles. From this, MNMA was able to supply the

14

arbitrator with the 80th and 50th percentiles responsive to factors six and seven. In other words, MNMA showed and ultimately acknowledged that the database does contain some sort of information—though it may not have been the type of information preferrable to MNMA—and that FAIR Health used that information to make the necessary percentile calculations. This is all that Section 1467.006 requires. *Id.*

Additionally, even if FAIR Health's database did violate Section 1467.06 as MNMA suggests, the arbitrator would not have been precluded from considering that data. While it is true that a Chapter 1467 arbitrator "must take into account" information responsive to Section 1467.083's ten factors—including any Section 1467.006 benchmarking data—there is nothing in Chapter 1467 that limits what other types of information can be provided to and considered by the arbitrator. *Cf. Nazarian I*, 653 S.W.3d at 758 (holding that substantial evidence supported arbitrator's award when it was based, in part, on evidence of relevant Medicare rates). An arbitrator must, after all, decide its disputes "based on the available information received," and is not prohibited from considering any particular sources of information in making its determination. 28 Tex. Admin. Code § 21.5021(g)(6).

Finally, Elliot's attested-to conversations with Devereaux pertained specifically to CPT codes 15756 and 15738—neither of which are relevant here. MNMA did not provide any evidence to support its contention that FAIR Health's data for CPT codes 33025 and 99223 was in any way unreliable for our purposes.

15

For these reasons, we overrule MNMA's argument that the arbitrator could not consider the FAIR Health data in making his determination.

### 2. The FAIR Health Data Was Some Evidence to Support the Arbitrator's Decision

It is true that some of the evidence weighed in favor of MNMA's original billed amounts and pre-arbitration offer—namely its billing statements, Dr. Nazarian's experience, and the complexity of the Patient's medical history and the care provided to her. However, it is also true that FAIR Health's benchmark data showed that Aetna's final offer was markedly closer than MNMA's to both the 80th percentile of billed charges and the 50th percentile of rates paid. Aetna's final offer for both CPT codes of $1,672.07 was 120% of the 50th percentile of rates paid and 49% of the 80th percentile of billed charges. In contrast, MNMA's final offer of $13,545 was 975% and 393% of those figures, respectively. Accordingly, we hold that there was at least some evidence to support the arbitrator's award. *See Axt*, 292 S.W.3d at 739. To hold otherwise would require us to impermissibly reweigh the evidence in favor of MNMA and to substitute our judgment for that of the arbitrator. *See Stewart*, 361 S.W.3d at 566.

For these reasons, we overrule MNMA's first issue.

## B. THE ARBITRATOR WAS NOT REQUIRED TO ISSUE AN EXPLAINED DECISION

MNMA's second, third, and fourth issues rely on a central contention: that the arbitrator was required—under Chapter 1467 and other authorities—to provide an

16

explanation for his award but failed to do so. This failure, argues MNMA, made it "impossible" to know if the arbitrator properly considered the ten factors or to deduce the bases for his decision. MNMA asserts that this lack of an explained decision (1) deprived MNMA of its right to meaningful judicial review, (2) prevented it from properly presenting its case on appeal, (3) violated its due-process rights, and (4) violated the open-courts guarantee.[6] MNMA grounds these arguments in Section 2001.174 of the Texas Government Code, which requires reversal if an appellant's "substantial rights" were prejudiced by an agency decision.[7]

---

[6]MNMA has not raised constitutional challenges to Chapter 1467 itself, only to the arbitrator's failure to provide an explanation for his decision, which MNMA argues violated various laws.

[7]Section 2001.174 reads in relevant part that

[i]f the law authorizes review of a decision in a contested case under the substantial evidence rule . . . a court may not substitute its judgment for the judgment of the state agency on the weight of the evidence on questions committed to agency discretion but . . . (2) shall reverse or remand the case for further proceedings if substantial rights of the appellant have been prejudiced because the administrative findings, inferences, conclusions, or decisions are: (A) in violation of a constitutional or statutory provision; . . . (C) made through unlawful procedure; (D) affected by other error of law; . . . or (F) arbitrary or capricious or characterized by abuse of discretion or clearly unwarranted exercise of discretion.

Tex. Gov't Code Ann. § 2001.174.

17

Aetna responds that no authority supports MNMA's contention that a Chapter 1467 arbitrator is required to provide a written explanation or specific findings with its decision. Again, we agree with Aetna.

### 1. Chapter 1467 Does Not Require an Explained Decision

A Chapter 1467 arbitrator is tasked with providing the parties with a "written decision" in which he determines which party's final offer is closest to the reasonable amount for the provided services. Tex. Ins. Code. Ann. § 1467.088(a). Upon making this determination, the arbitrator is required to select that amount as his binding award and to then "provide written notice [of this amount] in the form and manner prescribed by commissioner rule . . . ." *Id.* § 1467.088(c). The only TDI rule that speaks to the form of an arbitrator's decision requires that the arbitrator submit to TDI "the written decision, including any final offers . . ., [the] reasonable amount for the services or supplies, and the binding award amount." 28 Tex. Admin. Code § 21.5021(e).

Thus, under Chapter 1467, arbitrators need only provide written notice to the parties announcing their decisions. Tex. Ins. Code. Ann. § 1467.088(a). It does not impose upon them any duty to explain the decisions or to issue findings of fact and conclusions of law as MNMA argues. *Cf. Stage Stores, Inc. v. Gunnerson*, 477 S.W.3d 848, 857 (Tex. App.—Houston [1st Dist.] 2015, no pet.) (explaining that, in the context of Title 7 arbitrations and absent an agreement to the contrary, an arbitrator must issue only a "standard award," which "simply announces a result without any

18

reasoning or explanation"). And we may not read into the statute any such requirement. *See Entergy Gulf States, Inc. v. Summers*, 282 S.W.3d 433, 443 (Tex. 2009) ("'Courts must take statutes as they find them.'") (quoting *Simmons v. Arnim*, 220 S.W. 66, 70 (Tex. 1920)).

## 2. No Other Authority Cited by MNMA Requires an Explained Decision

Beyond Chapter 1467, MNMA argues that four additional authorities require a Chapter 1467 arbitrator to issue an explained decision: (1) Texas Rules of Civil Procedure 296 and 297, (2) the requirement that trial courts sufficiently explain their reasoning when granting new-trial motions, (3) due process and the open courts doctrine, and (4) Texas Rule of Appellate Procedure 44.1.

### a. Rules 296 and 297

First, citing to Texas Rules of Civil Procedure 296 and 297, MNMA argues that the arbitrator was required to explain his decision because otherwise MNMA was left to "only guess at the reason the arbitrator ruled against [it]." *See* Tex. R. Civ. P. 296, 297 (explaining under what circumstances a trial court must file findings and conclusions after a bench trial). MNMA likens the Chapter 1467 arbitrator to a trial court who has decided a case after a bench trial and is then asked to submit findings of fact and conclusions of law. According to MNMA, without findings and conclusions from the arbitrator, it was prevented from presenting its arguments to the trial court and on appeal.

19

We overrule this argument because Rules 296 and 297 are not applicable to this dispute.

### b. Motions for new trial

Second, MNMA argues that the arbitrator should have been required to explain his decision under Supreme Court of Texas precedent establishing that trial courts must adequately explain their reasons for granting motions for new trial. *See In re United Scaffolding, Inc.*, 377 S.W.3d 685, 688 (Tex. 2012) (orig. proceeding). MNMA states that allowing Chapter 1467 arbitrators to issue unexplained decisions would "effectively preclude[] reviewing courts from discharging" their duty to reverse those decisions when they prejudice an appellant's substantial rights.

We overrule this argument because this appeal does not involve a motion for new trial.

### c. Due process and open courts

Third, MNMA argues that due process and the open-courts doctrine require Chapter 1467 arbitrators to issue explained decisions. Without an explanation from the arbitrator, MNMA contends that it was improperly denied a full and fair hearing and access to the courts because (1) it could not adequately present its arguments for judicial review and (2) the reviewing courts could not adequately decide whether the decision was proper.

While MNMA may have gained some due-process traction had it attacked Chapter 1467's mandatory, barebones arbitration scheme itself, it has not done so. *See*

*Nazarian I*, 653 S.W.3d at 758 (explaining that Chapter 1467 is mandatory, explicitly prohibits discovery, and is decided on the written information submitted without a formal hearing). Instead, MNMA's complaint narrows in on the arbitrator's inaction—namely that he violated Chapter 1467 by not issuing an explained decision and, in doing so, drew a veil over the arbitration proceedings so as to preclude meaningful judicial review. But we do not see the lack of an explained decision as having blocked MNMA from presenting its case in court or as having so clouded our view that we could not properly evaluate the arbitrator's decision.

As described above, the arbitrator was provided information responsive to the ten statutory factors; the entirety of this information was then made part of the trial court and appellate records. Thus, both we and the trial court were made privy to the universe of information used by the arbitrator in making his decision. On de novo review, we are simply tasked with looking at that information and determining whether there existed some evidence to support the arbitrator's award. We do not need an explanation or findings and conclusions from the arbitrator to make this de novo determination.

This type of review is not new to us. Courts routinely review lower-court and arbitration awards without anything more than an unexplained, standard decision. *See, e.g.*, *Cat Charter, LLC v. Shurtenberger*, 646 F.3d 836, 844 (11th Cir. 2011) ("Generally, an arbitrator need not explain her decision; thus, in a typical arbitration where no specific form of award was requested, arbitrators may provide a 'standard award' and

simply announce a result.") (citing *United Steelworkers v. Enterprise Wheel & Car Corp.*, 363 U.S. 593, 598, 80 S. Ct. 1358, 1361 (1960)); *Shields Ltd. P'ship v. Bradberry*, 526 S.W.3d 471, 480 (Tex. 2017) (announcing the standard for reviewing bench-trial judgments in the absence of findings and conclusions); *Dyegard Land P'ship v. Hoover*, 39 S.W.3d 300, 307 (Tex. App.—Fort Worth 2001, no pet.) (announcing the standard for reviewing a summary judgment when the grounds supporting the judgment cannot be ascertained). For these reasons, we overrule MNMA's due-process and open-courts arguments.

### d. Rule 44.1 reversible error

Fourth, MNMA argues that the arbitrator's failure to issue an explained decision was reversible error because it prevented MNMA from properly presenting its case to the trial court and this court. *See* Tex. R. App. P. 44.1(a) (providing that "no judgment may be reversed on appeal on the ground that the trial court made an error of law unless the court of appeals concludes that the error complained of: (1) probably caused the rendition of an improper judgment; or (2) probably prevented the appellant from properly presenting the case to the court of appeals").

We overrule this argument because, for the reasons explained above, we find no error related to the arbitrator's failure to issue an explained decision and, thus, need not apply a harm analysis under Rule 44.1(a). *See Haynes v. Union Pac. R.R. Co.*, 598 S.W.3d 335, 357 (Tex. App.—Houston [1st Dist.] 2020, pet. dism'd) (explaining

22

that appellate courts do not need to conduct a Rule 44.1 harm analysis if they find no error in the relevant complaint).

Accordingly, we overrule MNMA's second, third, and fourth issues.

### C. WE WILL NOT REVERSE, RENDER, OR REMAND

In its fifth and final issue, MNMA argues that, because the arbitrator's decision should be reversed, the appropriate remedy is for this court to render judgment in its favor or to, alternatively, reverse and remand back to the trial court. But, having overruled all of MNMA's arguments for reversal, we affirm the trial court's judgment and need not decide this issue. *See* Tex. R. App. P. 47.1.

### V. CONCLUSION

While we are sympathetic to Dr. Nazarian's dissatisfaction with being reimbursed only $1,672.07 for seemingly complex and life-saving medical care, we are compelled by the strict confines of Chapter 1467 to uphold the arbitrator's award because there was at least some evidence to support it, and we may not substitute our judgment for that of the arbitrator. *See Stewart*, 361 S.W.3d at 566. Accordingly, we affirm the trial court's judgment confirming the arbitrator's award.

/s/ Brian Walker

Brian Walker
Justice

Delivered: April 27, 2023

23